The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention where the Court is now sitting. God save the United States and this Honorable Court. Thank you very much. Please be seated and good morning to all of you. We are ready for arguments this morning. First case is Robinson v. Boston Scientific Corporation. Ms. Kosicki. Okay, Kosicki. Glad to hear from you. May it please the Court. My name is Jessica Kosicki and I represent the appellants, Brenda and Rex Robinson, in this matter before the Court today. In my time before the Court, I will explain why the District Court erred in granting Boston Scientific's motion for summary judgment on the affirmative defense of statute of limitations for two reasons. First, the District Court's interpretation of Utah law was far too narrow. And second, the District Court applied the incorrect standard placing the burden on the appellants instead of Boston Scientific when granting the motion. Procedurally and factually, the background is that Ms. Robinson was implanted with a Boston Scientific Optics device. You might go ahead to your legal arguments. I think you can . . . Okay. No, we know the facts. We'll ask you if we don't. Certainly, Your Honor. But thank you for starting. You have to start there. Thank you. So this will bring me to my first point and that is that the District Court, its interpretation of Utah law was far too narrow. The law in Utah for products liability is governed by a statute. And the products liability statute in Utah has a built-in discovery rule. And that statute says that a civil action shall be brought within two years from the time the individual who would be the claimant in such action discovered or in the exercise of due diligence should have discovered both the harm and its cause. Do you think that's cause and fact? Well, Your Honor, the Utah Supreme Court has not . . . I'm asking you what you think. Yes, Your Honor. You think that the person or the victim has to be at least on inquiry notice to check into the cause and fact, what caused the injury? Yes, Your Honor, to the extent that the person that was injured should be on inquiry notice that there was something wrong with the product. Something happened that shouldn't have happened. And it was because of the product, not necessarily any reaction that would be the . . . And that's what the doctor told her in 2007. The doctor told her that she had a mesh erosion in 2007 that was caused by estrogen and intercourse. And so Ms. Robinson was under the impression that the reason that the estrogen happened was because of her own estrogen . . . I mean the erosion happened was because of her own estrogen status. The doctor testified that these erosions are caused by estrogen status and intercourse. And he further testified that he sees this in post-menopausal women because their tissues are very thin. And they don't have the vascularity that a well-estrogenized tissue would. Under your view, when would the statute of limitation have started running for your client? Has she not seen the commercial? Well, Your Honor . . . When would it have started? I guess that would be whenever she was on notice that there was something wrong with the product. So, a hundred years from now? Well, I don't think a hundred years from now, Your Honor, but . . . Well, what would, under your theory, would limit it? Well . . . I guess what she would have to do, what, read a medical journal or see a TV commercial before her statute started running? In this case, Your Honor, she saw the TV commercial. No, no, I'm asking what would it take? If she hadn't seen the commercial, the statute of limitation wouldn't start running until she read an article on it or saw a commercial? What would start the statute of limitations in your view? Whatever happened that would put her on notice that there was something wrong with the product. So, if a doctor told her that there's something wrong with the . . . Inquiry notice that there's a problem and she has that mesh and, therefore, that's a possibility and she has to figure it out and go find some information? Isn't it inquiry notice? Inquiry notice to look into the fact that there's a problem with the product. In this case, she was told it was estrogen status and intercourse which caused the erosion. She had no idea there was anything wrong with the product at all. Did the doctor tell her that the revision surgery, which he did in May of 2007, that that should make her feel much better? He told her that it would help her pain with intercourse, but it did not. Why doesn't that put her on inquiry notice that he's wrong and there is something else that she needs to check into? Well, she was still under the impression that this was her estrogen status. She was continuing to have estrogen, take estrogen. But you can't rest on that, can you, that it's your idea of what's wrong? Inquiry notice means you have to check, not that you just have some idea, but inquiry notice means, doesn't it, that you have to check and pursue due diligence to figure out what's wrong. Yes, Your Honor. However, in this case, she didn't . . . there was no indication that there was anything wrong with the product. Didn't she know after her surgery, I'm talking about the May surgery, May 4th, I think, and 7th. Yes, Your Honor. Didn't she know shortly thereafter that she wasn't better? She said the same pains continued up to 12 until it was taken out. Wasn't she on some inquiry notice at that point? No, Your Honor, because, again, she was under the impression that her estrogen status was the problem here. So the surgery in 2007 was to fix the erosion, but, however, her estrogen status never changed. She continued to take estrogen. She continued to have problems throughout. And it wasn't until she saw the commercial . . . How did she know that it was her estrogen status? That's what Dr. Wild, the implanting physician, told her. But isn't it true after that revision surgery that she knew that what he was saying wasn't completely correct? Because he told her it would get better, and it didn't get better. So why doesn't that lead to some inquiry notice that she then has to double-check because what he told her isn't right? Well, she was under the impression that it just wasn't successful. So she didn't know . . . No, I know that, but inquiry notice is more than that. Inquiry notice is you just can't pass off what's going on for something that you think. Inquiry notice means you have to check into it. That seems to me, that seems the point, that you have to deal with the statute of limitations. I sort of think you have a pretty good argument through the surgery, through the revision surgery, because it's my impression that when the doctor talked to her when she went back to visit before the second surgery, that at that point the doctor thought it had nothing whatsoever to do with the mesh, nothing. He said it's a great product. He still thinks it's a great product from what I can tell. And he told her that revision surgery would help her. It would ease the pain, at least some of the symptoms she was having. He takes the revision surgery, which she agrees to, and she doesn't get better. It seems to me at that point she now is kind of the classic inquiry notice as to cause . . . In fact, I'm giving you that just for purposes of the argument here, that she has to pursue what is going on and maybe what that doctor told her, including the lack of estrogen, that that could be wrong. And she's on some kind of notice that she's having the problems continue and what her doctor has told her appears not to be correct as far as solving it. Why doesn't that put her in the status for an inquiry to try to figure out what is wrong? Well, Your Honor, her husband and her testified that it did get better. Her problems got better for a period of time after the second surgery, the revision surgery. But it came back before the end of seven, didn't it? I believe . . . I don't know the time frame, Your Honor. I apologize. She has made the statement that it continued on afterwards. She can't . . . Well, let's give you until eight. It still doesn't help you with the two-year statute of limitations. It certainly came back before 2012. Yes, Your Honor, it did. However, again, she was still under the impression that it was because she was post-menopausal and it was her estrogen status that was causing this. So she didn't know that there was anything wrong with the product until she saw the commercial and she realized that this was happening to other people, to other women. And it wasn't until that point that she realized that this might be a problem with the product. She called a doctor and she was immediately seen. So she was very diligent after she saw that. I don't think that defends you. I don't think that protects you on inquiry notice. I'm trying to think of a hypothetical quickly. But if somebody were to have an operation and have a rod put in his arm and the doctor goes, this is a difficult operation. I'm going to put the rod in your arm. I think you'll be all right. And immediately after surgery, he's having pain with his arm. But he's saying, you know, gosh, the doctor maybe it's a tough surgery. He told me it's a tough surgery. So, you know, maybe I think it's just the doctor didn't have one of his best days operating. But I think in most states that inquiry notice starts running then that he has a problem and he has to check into what the problem is. I think the statute would start running on the makeup of that rod immediately. You just can't. I don't see. Your theory seems to be you can rely on your own idea of what the problem might be to delay the onset of the statute of limitations. I don't think that's the law, is it? Well, that's not exactly what the position is. She relied on her doctor who told her that it was. I know that, but listen. But her doctor, she knew after the revision surgery that her doctor wasn't right because isn't it true what her doctor told her turned out not to be true after the revision surgery? He told her that the revision surgery should help, and it did for a period of time. However, ultimately she ended up having another erosion. She didn't think that when he said it should help that it was just going to help her for a couple months. She didn't think that. She thought it was going to help with the situation. She did think it was going to help with the situation. However, because of what he told her with her estrogen status, she was under the impression That scared me. I'm sorry. She was under the impression that her tissues were thin. We told the courtroom deputy, if you ever give her an answer that's not a good one, she can beep you. Your Honor, if we look to Utah and if we look to Aragon, which is the appellate court that has interpreted the Utah Products Liability Act, and we look to what that court relied upon, that court relied upon North Coast Air Services v. Grumman, which was a Washington State case. Yeah, I know all that. I've given you that. I've given you what you have to do. I'm giving you your interpretation of that being causation or cause and fact. I've given you that. That's the point you make, isn't it? Yes, Your Honor. You think when it says harm and cause that and cause means something else. It means we have to see the cause and fact, not just the injury. But I'm trying to focus on just that part. Sure. Isn't there an inquiry notice? I mean, you think your view is after the revision surgery, when she did not get better, at least after a couple of months, she was not better, that she could still just go along because the doctor? I mean, what's her reason for not exercising and being responsible for the duty of inquiry at that point? Well, again, Your Honor, at that point, she was under the impression that this was just her body. This was her body. This was her estrogen status. Question just about that, and maybe I'm misunderstanding, but even if you think it's your estrogen status that's causing the problem, isn't that a problem with the product? I mean, it's a product that's being used on women who are postmenopause, so how is that not? I'm not seeing quite as much space as you are between, oh, it's just her estrogen status and it's a product effect. If the product doesn't work with women who are postmenopause, isn't that a problem with the product? Well, Your Honor, arguably, yes. However, what Ms. Robinson didn't equate it to a problem with the product. Her doctor said, look, your tissues are thin. You need to add estrogen. He added estrogen. He said, you have a small erosion. We'll go in and we'll fix it. And at that point, I mean, he even testified that he talked to her about it and said, you know, you're postmenopausal, there's not as much. He might not have equated it to the product. She is an individual, but she should have, under the discovery rule and inquiry notice. So you have to look at it globally, don't we? Not just what she apparently kept thinking. Well, Your Honor, she was relying on what her doctor told her. And so she wasn't inquiring into the product and a problem with the product. She had no idea that there was anything wrong with the product because she was under the impression that this was an issue with her estrogen status and that she was prescribed estrogen. She took the estrogen. She refrained from intercourse, which is what her doctor. I go back to Judge Shedd's question at the beginning. Where does it end? Where is the end to any statute of limitations under your theory? Well, Your Honor, it would end on whenever there's a commercial. Not necessarily a commercial, but if her doctor had told her there's a problem with the product, if there was a recall or something like that that would indicate that there was an issue with the product and it wasn't just she just happened to be unlucky and this was just not a successful surgery. And so whenever that happens, that would trigger that there's a possible problem with the product, there's a defect in this product. It's causing erosions across many women, not just her, other women that have low estrogen and women that don't have low estrogen. And then she would have been on notice that, okay, I need to look into this. And that's exactly what she did. When she saw the commercial in February of 2012, she called the number, she called a doctor, and she went into the University of Utah and saw a doctor about the erosion, the pain and the problems that she was having, which ended up being another erosion. And she filed her lawsuit within five months. So she was very diligent once she connected the fact that there's a problem with this product, that it's not just my estrogen, like I was told by my doctor, and like I thought for all these years that it was a problem with my estrogen. There's other courts that have Bridgewaters v. Toro is another district court case in Utah that it was cited before Aragon, but it's cited to North Coast. Why do you think the judge applied the wrong standards? You made that argument, too. Yes, Your Honor. If you look at the district court's order starting on page three, he cites the standard for granting a motion for summary judgment as if the burden was on the non-moving party at trial. Your Honor, if I may briefly conclude. You need to take five seconds, 15 seconds and answer. You've reserved some time, your choice. Okay, I'll just leave it at that. Thank you very much, Your Honor. Thank you. Gosh, those beeps are loud. Mr. Rogers? Have you ever heard beeps that loud before? Have you ever heard beeps that loud? You think it might be? I wonder. Ready to hear from you. I think. May it please the Court, my name is Daniel Rogers. I'm here with my co-counsel, Mike Bonasso, and together we represent Boston Scientific Corporation. Your Honors definitely have a good handle of the facts in this case and definitely a good handle on the law. We wholeheartedly agree that the issue in this case . . . You're wrong about . . . Your position is wrong when you say that when she went to see the doctor, she was on inquiry notice, and the fact that the doctor dismissed it being anything other than the cortisol, the estrogen, she wasn't on inquiry notice at that point, was she? When she went back to see Dr. Weil? Your Honor, we believe that that was putting her on inquiry notice at that point. Tell me, under your theory, how do you deal with the fact that Dr. Weil dismissed the product as any problem whatsoever? Is that equitable tolling? What is that? Certainly that time can't run against the appellant in this case, can it? Your Honor, I don't agree entirely with . . . I'm just asking you, can that time when she goes in because she's having a problem and the doctor, you think the only, certainly a reasonable inference she's entitled to, maybe the only inference is the doctor, when he talked to her when she went back to see him, I think it was in January, right around the turn of seven, turn two-seven, he did not think there was any problem with the mish, did he? Your Honor, I don't think . . . He didn't think that from the record, did he? I don't think the record bears out that he told her there's nothing wrong with the mish. Did I ask you that question? I said he didn't think it, did he? We don't know what he thinks . . . Are you sure about that? . . . because we have his testimony that was taken five years later because of that . . . And he says it's a great product. He didn't say there was a problem with it then, did he? Now, wait a second now. Do you really want to dance around these issues like that? No, Your Honor. I'm not trying to dance around the issues. At least a reasonable inference, I think is probably the only inference, but at least a reasonable inference is that the time the doctor talked to Ms. Robinson, he did not in any way think the mish was a problem, did he? That is an inference that somebody could draw. We believe that there . . . She's entitled to that inference. So that being the inference, what is anything that he tells her in that meeting in any way from that time forward count against her? If we look to the District of Utah cases which have been cited to the court, for example, you're talking about the case in . . . Just answer that question for me. How can that time be used against her when maybe she was on something like inquiry notice because she had the pain and she went in and her doctor, the reasonable inference is, the doctor completely dispelled the possibility of it being the mish itself. So how do you start time counting against her when her doctor has responded to what might be an inquiry notice by saying in essence the inference is it's not the mish? I think there's two inferences that could be drawn there. I agree with Your Honor . . . She's entitled to the inference. Right, and so if you believe that there are two inferences to be drawn, she's entitled to that inference, right? And then there's another inference that can be drawn that he didn't say completely there was nothing wrong with the mish. If we look to the Utah District Court cases when they have that scenario, what they say is that puts you on inquiry notice to investigate because . . . No, but you're missing the point. She did investigate. She went to her doctor with pain and he . . . I don't know what you're talking about, two inferences. She's entitled to the inference on your motion. She's entitled to the inference that the doctor . . . did not convey to her anything about the mish. He didn't think it was a mish. He gave her other basis for the problems. So now that's the facts that she's entitled to. How does that then, the time from the doctor's consult with her, how does that time not get stayed or told or stopped if it even started? The doctor inferences, the doctor let her know it's not the mish. Well, I understand what you're saying, Your Honor. Number one is if you're talking about things like equitable tolling or fraudulent concealment, that time doesn't count against her. I'm not asking you what I'm talking about. I'm asking you to tell me how that time runs against her under any kind of theory. Under the Utah case law and the district courts in Utah, the way they've interpreted it, is that there is a due diligence requirement when you have inquiry notice. And so if your inquiry notice that there's a potential allergic reaction to the product, right, not that there's a defect in the product, but you're having an allergic reaction. You don't answer my question. I'm saying, and I take the purpose of the question to get you to answer it this way, I guess, to explain it to you, that her due diligence is met when she has the problem, she goes to the doctor, and the doctor lets her know it's not the mish at that point. Then why has that not met her due diligence at that point? The doctor conclusively tells her that there is no problem with the mish. I understand. I agree with your Honor. I didn't ask you that. You answer my question. You know what? When you dodge it, it makes me think the answer is going to hurt you. No. So the point is she's entitled to it. Just don't retrace it. She's entitled to the inference that the doctor let her know what was wrong, and the doctor thought there was no problem with the mish. Okay. The reasonable inference, then, that she can take that is the doctor has indicated to me there's no problem with the mish at that point. Then why hasn't that satisfied her due diligence on notice inquiry at that point? At that point, under the facts as you describe, Your Honor, yes. I'm trying to say that I don't necessarily agree with those inferences, but under what you said, I agree. I agree with what you said. Because I'm not sure I'm understanding your legal argument. Do you agree that she has to know or be on inquiry notice that it's a product defect with the mish? No, Your Honor. We don't believe – That would be your answer. It doesn't matter that she didn't think it was the mish. She doesn't have to think it's a product defect. And that's, Your Honor, that's the point that I was trying to come back to from the Utah cases. They don't say that you need that. They just say if you know of a possible connection between the product and the injury, then that puts you on inquiry notice to do an investigation. And so, yeah, of course, at that point in time, then, she had a duty of due diligence to look to see are there other things that are causing this problem, you know, and do under her investigation rights. Because the Utah law on inquiry notice is particularly strong. It's some of the strongest that I've read. My question presumes she had inquiry notice. She was on inquiry notice when she goes back for the consult with the doctor. I'm asking you to explain to me under your theory what does it mean when a doctor accepts this now that the doctor says your problem is X. Inference says it's not Y. Why doesn't that at that point satisfy the due diligence under the inquiry notice as to why at that point? Yeah. Under that construct at that particular time, so that's the April visit that Your Honor is referring to, right? And there are still obviously subsequent events that occurred in May and then after that for the five-year period. That's what I was going to ask you to go to. Did you argue that to us in your appeal? Hey, we did not specifically, no. We relied on the April date that the trial court found. We believe that that is the date under the Utah law. If we don't believe that, what happens to your argument? There's undisputed facts in the record from which she had inquiry notice after that fact, and we've argued to the court that she waited an extended period of time after that. It wasn't just two years. It wasn't like she filed two years in one day, right? I mean it was a five-year period after that point. If that's going to be your argument to us now, even if it wasn't in your briefs, which I couldn't find it in your briefs. I agree, Your Honor. But she has to have notice of this construct of inquiry notice, doesn't she? Does she have it below? She was on. I'm sorry. I didn't understand the question. Does she have notice of this argument below? Did you argue it below? I'm talking about the post-revision surgery inquiry notice. Do you understand what I'm saying? No, no, no. I'm trying to recollect exactly the summary judgment argument, Your Honor. You argued in your summary judgment. I read your argument yesterday again, but you did, didn't you? You argued below that you said the 25th date was a critical date, but you also indicated in your summary judgment motion below that even beyond that, then on in seven and eight, she said, and she does testify, her pains continued from that revision surgery, roughly that. Isn't that your argument? And we didn't make that argument in that way in our appellate brief, but we did provide the same facts that you're talking about in our appellate brief. We cited the facts that she still continued to have pain, which she attributed to the mesh, for the next five years until she filed suit, which is what Your Honor is talking about. In the argument section, we didn't repeat that same argument. We defended the trial court's decision to use the April 25th date. I don't know what you're saying right now, but the point is you didn't argue that to us, but you did argue it below, and I guess you would say they were on notice of your argument, that that inquiry notice existed after the revision surgery, and you can't help which date the judge picks below. He picked the 25th because he thought that was the appropriate date, but you think it's fair for us, if we decide the 25th doesn't do it, that a subsequent date could? Of course, Your Honor. I mean, we have de novo review, and absolutely. You know, it's still our position that the 25th date, the April 25, 2007 date, was a date upon which she was on, but I understand Your Honor disagrees with the inferences. Do you think that a doctor could ever end, this is hypothetical, could a doctor ever end your due diligence and protect you against the statute of limitations if he tells you conclusively, absolutely, it wasn't the product? There are circumstances where that is true. The answer would be yes. Yes, there are circumstances. That's not this case, but yes. So your argument is you could do it if the doctor says it conclusively, but if that's a reasonable inference that the doctor said, that's not sufficient? Well, it obviously depends on the totality of the circumstances, Your Honor, and your hypothetical, all the facts I know is that the plaintiff was told. No, but I asked you about the reasonable inference. Let me change my hypothetical from conclusively told you to a reasonable inference from what the doctor told you is there's no problem with the product. Why wouldn't that get the same answer? Don't fight me on this so much. I'm just exploring this with you, it seems to me, because we're all doing the same thing it sounds like. When is she on inquiry notice? What does she have to do to suffice for her obligation? When is it met? When isn't it met? And it just strikes me the argument on the 25th, which I think is obvious to you, is I'm concerned about that. She's on something like inquiry notice before the 25th of April when she goes back to see the doctor. But it looks to me like there's certainly a reasonable inference, a very strong inference, I think, that the doctor dissuaded her of any concern about the product. When you see what he said would be the causes of it, estrogen issues or intercourse issues, that's what he says, right? That's what he told me the year before. And he said it hangs, the mesh is hanging, the tape is hanging low or something like that. She knows that in the whole scenario. When he then says, at the time I told her, what do you think about the product? I think the product's great. Even when he talks about what he told her, he's still saying he thinks the product's great. So I think from those facts, certainly at least an inference she's entitled to, is he didn't think it was. And if he didn't think it was the mesh, he clearly would not have conveyed that to her. So I'm just saying if she does get that inference, why isn't it like the conclusion that it's not a problem? Why isn't that the same for purposes of summary judgment? You understand my question. It was kind of long. I think I do, and if I don't, I'm sure Your Honor will correct me. I'll try. The way that the Utah law reads is that when you have that situation and you have noticed that there is a potential issue with the product, and then the case law talks about if you have reasonable inferences, well, it could be a problem with the product or it could be an allergic reaction or something like that. No, that's a different kind of reasonable inference. That's a reasonable inference that she's thinking about in her duty of inquiry. That's where those inferences come to play. Her argument isn't that. Her argument is, what I was thinking, I was allowed to think. I don't know that that's the law. If you can draw reasonable inferences, that underlies that duty of inquiry. That's when you have to make an inquiry. You can put that aside. I'm giving you the benefit of the doubt on those first inferences. Something's wrong. I better go find out what it is. I'm just wondering about when your doctor tells you, and you said if he states it openly and in a conclusive way, it's sufficient to end your duty of inquiry. I'm just wondering about the inference in this case wouldn't do the same thing. Well, Your Honor, I answered that question if he conclusively said it and there were no other facts that would point to a different conclusion. That's the way I understood Your Honor's hypothetical, and so that's why I answered in that way. But if you look in the hypothetical situation where, yeah, the doctor may have told her conclusively one way, but there are facts that are available to her that she knows about that may point in a different direction. Wait a second now. So let's just walk through this. You all interrupt me if you all want to do something else. You go see your doctor. I've got this pain. He goes, I'm telling you right now, it's one of these two reasons. It is not the mesh on this hypothetical. She has to disbelieve her doctor and go looking for other information to fulfill her duty of inquiry? Is that what you say the law is? Your Honor, I'm trying to understand the hypothetical so I answer your question correctly. It's very simple. This is a hypothetical. She goes to the doctor and goes, I'm in tremendous pain, and he says, I can tell you right now, it's one of two things, but I can tell you right now, it's not that mesh. You understand me? It's not that mesh. She still has to go to another doctor? If she has no other facts that point to her and it's only that opinion, Your Honor, I understand. I mean, there's still the issue of does she have to know that there's a problem, quote-unquote, and I understand. No. Does she have to go to another doctor, yes or no? Am I hypothetical? In your hypothetical, without any others, personally, I believe yes. She would have to go because she may believe. So your view of the law is if you go to your doctor and the doctor tells you conclusively there's not a problem, you have to consider him to be incompetent or a liar or you just sue right then, sue everybody right then. That's where your theory leads. No, Your Honor, and maybe it's because I view the hypothetical as including facts that may point her in a different direction, but I understand that if the only world in which she lives . . . If you want to ask hypotheticals, you can sit down and talk to your law partner about that. I'm just asking you to answer my hypothetical. Yeah, under your hypothetical, Your Honor, if there's no facts that lead to a different conclusion, then she has no notice that there is somebody to sue at that point. If there's no possible causal relation between, and she is conclusively told there's no possible causal relation between the two, then the third element of the Utah statute of limitations test is not met at that point. I would agree with that interpretation, Your Honor. I don't have to go any further than her doctor in my hypothetical at that point. In your hypothetical, Your Honor, it's difficult to imagine a situation where she has inquiry notice of other facts, right? I believe that this case included other facts outside of that. Now I got that. But I'm trying to answer Your Honor's question as best I can. You see what I'm doing? I'm just focusing in. This is just of interest to me and maybe the way the decision has come down from the lower court because he picks that date and it seems to me there may well be problems with that date because I'm concerned with what her doctor told her on that date. I think that even giving the plaintiff the benefit of the doubt on causation and fact under Utah law, it still seems to me there might be a problem because the doctor has satisfied, may well have satisfied the duty of inquiry at that point. That's why that date may not help you. I know you think it does, but I just wonder about that. It may not lose the war, maybe, if there are other things and she has another duty. I agree. Your Honor asked those questions and I heard those and I certainly agree with that after the surgery about what happened. As I understood it, I thought the district court relied on that date because the district court was applying a different legal standard. The district court thought it didn't matter whether she was on inquiry notice that there was a defect in the product so long as she knew there was a possible causal relationship. Maybe the product was fine, but nevertheless, it's hanging down. There's something about the product that is causing her injury and that's all he needed to know. Even if she has every reason to justifiably believe there's not a product defect, she still knows there's a causal relationship between the product and the injury. What if I think, just assume for a minute, that the district court was applying the wrong standard, that really the question is about the product defect and when she was on inquiry notice of a product defect? Should this case go back to the district court to let the district court look at that question in the first instance or is there enough in the record for us to answer that question now? Your Honor, I believe there's enough in the record to answer that because the record is not going to change when we go back down below. I mean, in this particular instance... When do you think she was on inquiry notice of a product defect? She was on inquiry notice of a product defect when she was told that the mesh was hanging down, it wasn't supposed to be doing that, and that it was causing her pain and it wasn't supposed to be doing that. And the doctor says, if I remove part of it and if I do a revision surgery, then that is... So that's the April 25th date... Even if at the same time the doctor's saying, but there's no problem with the mesh itself. Your Honor, we believe that's the date. Obviously, as we move forward and the events change, then she's on more inquiry notice of that, obviously. But at that point in time, whether it's a defect with the product or whether it's a possible causal relation with the product, we believe that she had inquiry notice and a due diligence requirement at that particular point. With the tape hanging down, though, the tape hanging down doesn't indicate there's any problem with the product. That could be a problem with the surgeon's skill in placing the product. And that's... And so you think that the fact that the tape, the statement, that's what the district court thought, that the tape hanging down puts her on notice of some causal relation to the product itself. But why is that so? Because if the tape is hanging down, Your Honor is correct that it could be because what the surgeon did, but it also could be because there was an erosion of the tape because the product was eroding through her tissue because of the defects the plaintiff claimed exist in the product. So when you have a situation where there's multiple, multiple different inferences, that's when the Utah inquiry notice law kicks in and she had a duty to investigate at that particular time. Thank you, Your Honor. Thank you very much. Thank you. Ms. Kaczewski? Ms. Kaczewski? May it please the Court, a couple of points on rebuttal. The cases that the district court relied upon can be distinguished from this case. In virtually all of them, the plaintiffs knew that there was something wrong with the product. For the Cannon case, it was a case where a plaintiff was applying some gel cream to their neck and it was causing boils, and the doctor said, stop using that, it's causing these boils. The plaintiff contacted the manufacturer, filed an FDA adverse event report, and wrote a letter to the manufacturer saying, I'm afraid I'm going to have a lifetime worth of problems because of this. So in that case, the plaintiff knew very well that there was something wrong with the product. Same for Hansen v. Novartis. This is another case that the district court relied upon, and in that case, the plaintiff testified repeatedly that she thought there was a defect with the membrane of the pain patch. So she thought there was a problem with the product. Same for McCollin v. Synths. This was a back surgery case, and in that case, the doctor, the implanting physician, said, your implant failed. So she was on notice that there was a problem. It had failed. And for Griffiths-Raths v. Sulzer-Spine, this is another case that the district court cited. But also, in this case, the plaintiff testified that she thought there was a defect with the back cage that was implanted before she even left the hospital. And finally, Pratt v. Cavanaugh, North America. This case involved a propane leak, and the investigator that investigated the fire that happened to plaintiff's house found that the valve was irregularly shaped, and that's what caused the fire. Again, the plaintiff knew there was a problem with the product in all of these cases that the district court relies upon. And so in that instance, they can be distinguished from the case here, where Ms. Robinson was only under the impression that it was her estrogen status and intercourse that were causing the erosion in the pain. And so my second point, Your Honor, was that the district court applied the incorrect standard when granting summary judgment in favor of Boston Scientific. If you see from page 3 of the order, he recites a standard that suggests that Ms. Robinson bore the burden because he says the burden is on the non-moving party at trial. And if you look at the order, I don't think it's a pro forma recitation of a standard. If you look at the order and you look at the fact that he never said in his order that Boston Scientific was required to prove anything or produce evidence on anything, and he repeatedly said that the Robinsons needed to produce evidence on this or that on page 11 and 10 of the order. How do you think that wrong standard affected him? What was the result of his applying the wrong standard? I couldn't quite follow your argument on that. What wrong standard did he apply, and how did that affect you on the facts of this case? Sure, Your Honor. He placed the burden of disproving the statute of limitations on the Robinsons versus placing the burden of proving it on Boston Scientific. How did he do that specifically? Well, if you look at the order, Your Honor, at no point in it did he ever say that Boston Scientific was required to prove anything or produce evidence on anything. And for them to prevail on an affirmative defense, a motion for summary judgment on an affirmative defense, every aspect, every element must be conclusively proven. And instead, he required that Brenda and Rex Robinson provide evidence essentially disproving their theory. And if you look at the order as a whole, Your Honor, it appears that he's disregarded material facts, such as the plaintiff's implanting physician, the testimony of Dr. Wild when he said it was estrogen and intercourse. The plaintiff stated on her fact sheet that she didn't know until she saw a commercial that there was any kind of relationship between the product and the injuries that she'd suffer. He takes pieces of the fact sheet in some instances and ignores others. And so, in that respect, Your Honor, it appears that he has applied the wrong standard, placing the burden on . . . And if he'd applied the right standard, what results should he have gotten under his order and under our questions today? What difference does it make? Well, in that . . . What facts do you point to that make the conclusion any different? Well, Your Honor, if he had taken into consideration her testimony and her . . . Testimony as to what? As to what legal point? She testified that she thought that the pain that she was having was because of infections. She said on her verified fact sheet that she didn't realize that there was anything wrong until she saw a commercial in 2012. The doctor testified that he talked to her at length about the fact that this is caused by erosion and intercourse. And none of those were taken into consideration at the district court level. And so, if he had placed the burden on Boston Scientific, in that case, then the motion for summary judgment should have been dismissed. Denied. Sorry. So, for these reasons, if Your Honors have no further questions, the appellants are respectfully requesting that the district court's order be reversed and remanded. All right. Thank you. Thank you very much. Thank you. We will take it down to Greek Council and go directly to the next case.
judges: Dennis W. Shedd, Stephanie D. Thacker, Pamela A. Harris